## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 17 2017, 5:44 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jared Michel Thomas
Evansville, Indiana

ATTORNEY FOR APPELLEE

Patrick A. Duff
Duff Law, LLC
Evansville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Paternity of D.J. b/n/f:

Desiree Jennings,

*Appellant-Petitioner,*

v.

Leewayne Johnson,

*Appellee-Respondent*

April 17, 2017

Court of Appeals Case No.
82A01-1606-JP-1406

Appeal from the Vanderburgh
Superior Court

The Honorable Richard G.
D'Amour, Judge

Trial Court Cause No.
82D07-1004-JP-245

**Vaidik, Chief Judge.**

# Case Summary

[1] Desiree Jennings ("Mother") appeals the trial court's order granting Lee Wayne Johnson ("Father") primary physical custody and sole legal custody of their daughter. Finding that the evidence supports the court's modification of physical and legal custody but that the reduction of Mother's parenting time is a drastic change unsupported by the record, we affirm in part and remand with instructions.

# Facts and Procedural History

[2] Mother gave birth to a daughter, D.J., on January 13, 2010. Later that year, DNA testing established Father's paternity, but Mother maintained primary physical custody and sole legal custody of D.J. Father then petitioned the court for parenting time with D.J. and was awarded time pursuant to the Indiana Parenting Time Guidelines.

[3] In August 2014, Father petitioned the trial court to modify custody, child support, and parenting time. After multiple procedural delays, the court held a hearing on Father's petition a year later, in August 2015. At the conclusion of the hearing, the court issued a temporary order that Mother and Father "shall have joint legal custody of the child who shall reside one week with Mother and then one week with Father." Appellant's App. Vol. II p. 66. The trial court's order also stated, "The Mother has a history of unstable relationships with men including multiple instances of domestic violence. There have been instances

where the [child was] present during these episodes." *Id.* at 65. The court concluded that Mother's home was more unstable than Father's and that Mother has unresolved anger issues. As a result of her anger issues, Mother was ordered to attend and complete an anger-management course within four months of the court's order; she was also ordered to provide the court with a certificate of completion for the course.

[4] The court held a follow-up hearing on May 19, 2016. Father testified that he was concerned about D.J.'s hygiene during Mother's parenting time. Mother and Father were exercising the every-other-week parenting-time schedule, and Father said that "at the next exchange date my daughter would come home to me and she would still have, uh, [the] same underwear on that she left my house with the last previous Sunday." Tr. p. 14. D.J.'s underwear would be extremely dirty, and Father was "left with the impression that she had not been cleaned[.]" *Id.*; *see* Father's Exs. D – G (photos of D.J.'s dirty underwear). As a result of the dirty underwear, Father noticed that D.J. had a "bad odor" and took her to the doctor. Tr. p. 43. The doctor diagnosed D.J. with a bladder infection or urinary-tract infection (UTI) (Father could not remember the exact diagnosis); the doctor told Father that the infection was a result of D.J.'s dirty underwear.

[5] In addition to D.J.'s dirty underwear, Father had other concerns with Mother's parenting. During her parenting time, Mother surrendered on felony charges of fraud on a financial institution. Mother did not inform Father that she was surrendering, and Father was unaware of who cared for D.J. while Mother was

in jail. Father only learned that Mother was in jail from his wife's co-worker. After learning that Mother was in jail, Father called the police to meet him at Mother's house so that he could take custody of D.J. At the same time, Mother bonded out of jail and arrived home to find Father and the police. Father remained in his car, which was parked in front of a neighbor's home. He heard Mother scream at the officer to get off her property, curse at the officer, and call the officer "white trash." *Id.* at 57. D.J. was inside the house during this altercation.

[6] Father also stated that he was concerned about Mother's relationship with Michael Anderson, with whom she has a history of domestic violence, including an incident in front of D.J. One domestic-violence incident with Anderson resulted in Mother being arrested. Father stated that Anderson has been with Mother at the majority of the parenting-time exchanges.

[7] Regarding his relationship with Mother, Father testified that they have a strained relationship and do not communicate with one another. He stated that when they have communicated in the past, they have only done so via text message. He said that most of the time Mother does not respond to his messages. Father also said that they do not talk during the parenting-time exchanges. One example Father offered of their lack of communication dealt with a dentist appointment for D.J.; Mother made the appointment during Father's parenting time but did not tell him about the appointment. He only learned of the appointment when he found the reminder postcard in D.J.'s backpack, two days before the appointment. During her testimony, Mother

agreed that she and Father do not communicate. Mother admitted that she does not listen to Father when he talks, including his testimony during their hearing:

Q: And you didn't listen when he testified where he's employed?

A: No.

Q: Or at the last hearing when he testified he's employed?

A: Uh, nope.

*Id.* at 78. Mother countered Father's dentist story by saying that he failed to notify her that D.J.'s school-bus schedule had changed. The school had provided D.J. with notice of the change during Father's parenting time, but Father did not share this information with Mother.

[8] Regarding D.J.'s underwear and hygiene, Mother stated that she washes the clothes that D.J. wears at the parenting-time exchange (Father to Mother) and then dresses D.J. in the same clothes for the exchange the following week (Mother to Father). Mother claimed that the underwear was dirty from old stains and from being worn all day. Mother said that D.J. has a bathroom inside her bedroom and that "taking a bath is a normal thing in the household." *Id.* at 95.

[9] When asked about Father's other parenting concerns, Mother refused to answer any questions about her fraud case and invoked her Fifth Amendment

privilege against self-incrimination. Additionally, Mother informed the court that she and Anderson, the man with whom she has a history of domestic violence, had gotten married in July 2015. Mother had not informed Father or the trial court of her marriage despite being asked about her relationship status with Anderson at the previous hearing, which was held two months after the wedding. Despite being married, Anderson does not live with Mother on a full-time basis. Mother explained their living arrangements:

> [H]e comes over, if he spends the night he may spend the night, he might not come over for two (2) weeks, he may [come over] once a month, so I don't write down how many times [Anderson] comes over to my house but he's welcome to [come over], he's always welcome to come over to the home.

*Id.* at 65.

[10] Throughout her testimony Mother was "disrespectful" to the court and both attorneys. Appellant's App. Vol. II p. 24. At one point, the court prevented Mother from testifying about events that occurred before the August 2015 hearing, and she got upset. The court warned Mother that she would be "spending the next couple [of] nights in the Vanderburgh County Jail okay, if you have another outburst of snide, sarcastic comments directed to the Court . . . ." Tr. p. 102. Mother responded, "I'm sure you would like that, make [Father] look better, have more time with [D.J.]." *Id.* Mother was found in contempt and sentenced to ten days in jail. After a brief recess, Mother was given the opportunity to "purge herself" of the contempt ruling and said, "I apologize, that's all I have to say." *Id.* at 103-04. As a result, the court purged

the contempt charge but noted that Mother's apology was "somewhat half-hearted." *Id.* at 111.

[11] At the conclusion of the testimony, the trial court asked Mother for a copy of her anger-management completion certificate because it had not received a copy from her. The temporary court order had required Mother to submit proof of completion in January, four months earlier. Mother replied, "Anger management wasn't recommended with a therapist and I didn't get a certificate, no." *Id.* at 107-08.

[12] In its final order, the trial court found a "substantial and continuing change in circumstances" from its temporary order: (1) Mother continued to struggle with anger issues and ignored the court's order to attend and complete anger management; (2) Mother married Michael Anderson, who had engaged in domestic disputes with Mother in front of D.J.; (3) Mother has "a total disrespect for any person of authority," including police officers, attorneys, and the court; (4) Mother "seems to be unable to care for the general hygiene of her child," and D.J's underwear "appear[s] never to be changed and [is] filthy"; and (5) Mother was arrested on felony charges for fraud against a financial institution. Appellant's App. Vol. II pp. 24-25. The court granted Father sole legal custody and primary physical custody of D.J. Regarding Mother's parenting time, the trial court found that "unsupervised parenting time is not in the child's best interests and, in fact, would be dangerous to the child's physical and emotional health. The Mother shall have supervised parenting time . . . for one hour each weekend at her expense." *Id.*

Mother now appeals.

# Discussion and Decision

Mother argues that the evidence is insufficient to support the trial court's order modifying physical custody and that the trial court abused its discretion when it awarded Father sole legal custody of D.J. "Modification of custody is an area committed to the sound discretion of the trial court, and we are constrained to neither reweigh evidence nor judge the credibility of witnesses." *Albright v. Bogue*, 736 N.E.2d 782, 787 (Ind. Ct. App. 2000). Custody modifications will be reversed "only upon a showing of abuse of discretion, or where the decision is clearly against the logic and effect of the circumstances before the court." *Id.* (physical custody); *see also Higginbotham v. Higginbotham*, 822 N.E. 2d 609, 611 (Ind. Ct. App. 2004) (legal custody).

# I. Physical Custody

Mother argues that the evidence is insufficient to support the trial court's order granting Father primary physical custody of D.J. and Mother only one hour of supervised parenting time per week. To modify an existing custody order, the trial court must find that modification is in the best interests of the child and that there is a substantial change in one or more of the factors to be considered by the court. Ind. Code § 31-14-13-6. The court is to consider all relevant factors to the case, including:

(1) The age and sex of the child.

(2) The wishes of the child's parents.

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:

> (A) the child's parents;

> (B) the child's siblings; and

> (c) any other person who may significantly affect the child's best interests.

(5) The child's adjustment to home, school, and community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 2.5(b) of this chapter.

Ind. Code § 31-14-13-2.

[16] Mother raises multiple challenges to the sufficiency of the evidence. Mother's first argument is that "there was no evidence offered that [Mother] had made any negative or inappropriate statements to law enforcement officers in front of D.J." Appellant's Br. p. 15. Father testified that when Mother was in jail for

her pending felony case, he went to her house with police to gain custody of D.J. While an officer was at the house, Mother showed up and began screaming and cursing at the officer. Father believed D.J. was in the house during the altercation. Father remained in his car, which was parked in front of a neighbor's house, and heard every word that Mother was screaming at the officer. Mother did not deny this incident with the officer nor did she rebut Father's claim that D.J. was inside the house at the time. We do not find it illogical for the court to conclude that D.J. was inside Mother's home at the time of this incident or that D.J. could hear Mother screaming and cursing at police. *See Albright*, 736 N.E.2d at 787 ("Reversal is warranted . . . where the decision is clearly against the logic and effect of the circumstances before the court.")

[17]     Mother also claims that the trial court ordered the change in physical custody as punishment for her behavior in court. She correctly points out that "an award of custody may not be made or changed in order to punish a parent." *Clark v. Clark*, 404 N.E.2d 23, 35 (Ind. Ct. App. 1980). However, to prevail on this claim, "[Mother] must show not merely that the evidence might support her allegation, but that it positively requires her conclusion before we reverse." *Id.* (citing *Brickley v. Brickley*, 247 Ind. 201, 210 N.E.2d 850 (Ind. 1965)). Mother has not met her evidentiary burden. There is ample evidence in the record— Mother's altercation with police in her front yard, Mother's history of domestic violence with Anderson, and D.J.'s dirty underwear that caused her UTI or

bladder infection—to show that the trial court's order was not retaliatory for Mother's disrespectful behavior at the May hearing.[1]

[18] Last, Mother challenges the court's conclusion that "unsupervised parenting time is not in the child's best interest[s] and, in fact, would be dangerous to the child's physical and emotional health." Appellant's App. Vol. II p. 25. She argues that there is no evidence to support the conclusion that she poses a threat to D.J. "A parent not granted custody of the child is entitled to reasonable parenting time rights unless the court finds, after a hearing, that parenting time by the noncustodial parent might endanger the child's physical health or significantly impair the child's emotional development." Ind. Code § 31-17-4-1(a). Father provided the court with photos of D.J.'s dirty underwear, and D.J. was diagnosed with a bladder infection or UTI because of the dirty underwear. Furthermore, there was evidence that Mother had been involved in domestic disputes with Anderson, her husband, in front of D.J., Appellant's App. Vol. II p. 25, and that she had been arrested for at least one domestic-violence incident involving Anderson, *see* Tr. p. 66. We find that there is sufficient evidence to support the conclusion that Mother poses a danger to D.J.'s physical and emotional health and that the trial court was acting within its discretion when it ordered supervised parenting time for Mother  However, we conclude that the

---

[1] Mother also argues that "there was no evidence that the parties' minor child had ever witnessed any anger issues by [Mother]." Appellant's Br. p. 18. The court heard testimony that Mother screamed and cursed at an officer outside her home while D.J. was inside the home. Additionally, evidence was presented that domestic-violence incidents between Mother and Anderson have occurred in front of D.J. We conclude that there is sufficient evidence to show that D.J. has witnessed Mother's anger issues.

reduction of Mother's parenting time to one hour per week is a drastic change that is not supported by the record nor is it in D.J.'s best interests. We remand to the trial court to issue a new order granting Mother additional supervised parenting time with D.J.

# II. Legal Custody

[19] Mother also contends that the trial court abused its discretion when it modified its prior order and granted Father sole legal custody of D.J. Parents who are awarded joint legal custody "will share authority and responsibility for the major decisions concerning the child's upbringing, including the child's education, health care, and religious training." Ind. Code § 31-9-2-67. The issue of joint legal custody, in paternity proceedings, is governed by Indiana Code section 31-14-13-2.3, which states, in subsection (a), that "the court may award legal custody of a child jointly if the court finds that an award of joint legal custody would be in the best interest[s] of the child." To determine what is in the best interests of the child, subsection (c) provides a list of factors for the court to consider:

> (1) the fitness and suitability of each of the persons awarded joint legal custody;

> (2) whether the persons awarded joint custody are willing and able to communicate and cooperate in advancing the child's welfare;

> (3) the wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age;

(4) whether the child has established a close and beneficial relationship with both of the persons awarded joint custody;

(5) whether the persons awarded joint custody:

> (A) live in close proximity to each other; and

> (B) plan to continue to do so;

(6) the nature of the physical and emotional environment in the home of each of the persons awarded joint custody;

(7) whether there is a pattern of domestic or family violence.

Ind. Code § 31-14-13-2.3(c). We have previously held that factor (2) is "[p]articularly germane to whether joint legal custody should be modified." *Julie C. v. Andrew C.*, 924 N.E.2d 1249, 1260 (Ind. Ct. App. 2010) (discussing joint legal custody in a dissolution proceeding, under Indiana Code section 31-17-2-15).

[20] Mother contends that "the entire record is devoid of any reasons for seeking a modification of joint legal custody." Appellant's Br. p. 23. We disagree. The record is replete with evidence that Mother and Father do not communicate with one another, even regarding D.J. Mother did not alert Father to a dentist appointment that she made for D.J. during Father's parenting time. Father only learned of the appointment because he found the reminder postcard in D.J.'s backpack. Furthermore, Mother testified that she does not listen to

Father when he talks, including to the testimony that he provided at the custody hearings for D.J.

[21] Additionally, Mother has been involved in numerous domestic-violence disputes with her husband, including one instance that resulted in Mother being arrested. At least one of these domestic-violence disputes took place in front of D.J. We disagree with Mother's contention that the record is devoid of any evidence to support a modification of joint legal custody. We conclude that the court did not abuse its discretion when it modified its award of joint legal custody and granted Father sole legal custody of D.J.

[22] Affirmed in part and remanded with instructions.

Brown, J., concurs.

Bradford, J., concurs in part and dissents in part with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Matter of the Paternity of D.J. By Next Friend:

Desiree L. Johnson,

*Appellant-Petitioner,*

v.

Lee Wayne Johnson,

*Appellee-Respondent.*

April 17, 2017

Court of Appeals Case No. 82A01-1606-JP-1406

Appeal from the Vanderburgh Superior Court

The Honorable Richard G. D'Armour, Judge

Trial Court Cause No. 82D07-1004-JP-245

**Bradford, Judge, concurring in part, dissenting in part.**

[23] I fully concur with the majority's conclusion that the trial court acted within its discretion in granting physical and sole legal custody of D.J. to Father. However, I must respectfully dissent from the majority's conclusion that the trial court abused its discretion in reducing Mother's parenting time with D.J. to one supervised hour per week. Because I believe that the trial court was in the best position to determine the appropriate manner and amount of visitation

exercised by Mother, I would affirm the trial court's order in this regard. *See Duncan v. Duncan*, 843 N.E.2d 966, 969 (Ind. Ct. App. 2006) (providing that "[u]pon review of a trial court's determination of a visitation issue, we will grant latitude and deference to our trial courts"), *trans. denied*. I also trust that the trial court would be in the best position to grant appropriate increases in Mother's parenting time once she has made sufficient progress in addressing her issues. As such, I concur in part and dissent in part.